IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　　Plaintiff,<br><br>　　v.<br><br>FAYETTE COUNTY, TENNESSEE; and THE FAYETTE COUNTY BOARD OF COUNTY COMMISSIONERS,<br><br>　　　　　　Defendants. | Civil Action No. |

# COMPLAINT

Plaintiff United States of America alleges:

1. The county commission redistricting plan adopted by the Fayette County Board of County Commissioners ("County Commission") on December 14, 2021, ("2021 County Commission Plan") violates Section 2 of the Voting Rights Act, 52 U.S.C. § 10301. Black voters do not have an equal opportunity to participate in the political process and to elect their candidates of choice.

2. In the 2021 redistricting process, the County Commission disregarded the advice and recommendation of its own Redistricting Committee and outside redistricting counsel, all of whom endorsed redistricting plans that included multiple majority Black voting-age population ("BVAP") districts, and instead adopted a plan that contains no majority-BVAP districts.

3. Since the adoption of the 2021 County Commission Plan, four Black candidates have lost in general elections, and a fifth Black incumbent, who had won election for many years, lost in a Republican primary election. No Black candidate has been elected to the 19-

member County Commission under the 2021 County Commission Plan, even though the County has a BVAP of 25.9%.

4. The actions in the 2021 redistricting process are a continuation of the 2011 redistricting cycle, in which the County Commission successfully diminished Black political power. Notably, the number of elected Black Commissioners went from four in 2010 to one in 2018 to zero under the 2021 County Commission Plan.

5. The United States files this action pursuant to Sections 2 and 12(d) of the Voting Rights Act of 1965, as amended, 52 U.S.C. §§ 10301 and 10308(d).

6. For the reasons set forth below, this Court should declare that the 2021 County Commission Plan has the result and was adopted with the intent, at least in part, of diluting the voting strength of the County's Black voters in violation of Section 2 of the Voting Rights Act, and permanently enjoin Defendants from administering, implementing, or conducting any future elections under this plan.

## JURISDICTION AND VENUE

7. This Court has original jurisdiction of this action under 28 U.S.C. §§ 1331, 1345, and 2201(a) and 52 U.S.C. § 10308(f).

8. Venue is proper in this Court under 28 U.S.C. §§ 123(c)(2) and 1391(b).

## PARTIES

9. The Voting Rights Act authorizes the United States to file a civil action seeking injunctive, preventive, and permanent relief for violations of Section 2 of the Act, 52 U.S.C. § 10308(d).

10. Defendant Fayette County (the "County") is a political and geographical subdivision of the State of Tennessee.

11. Defendant County Commission serves as the County's legislative body. *See* Tenn. Code Ann. §§ 5-5-102(a)(1), (f). Elections are partisan and held in August, and County Commissioners serve four-year terms. *See* Tenn. Code Ann. §§ 5-5-102(e)(1)-(2). Under Tennessee law, the County Commissioners are tasked with drawing county commission boundaries. *See* Tenn. Code Ann. § 5-1-111(a)(1).

## ALLEGATIONS

12. Fayette County has a sizeable non-Hispanic Black population. According to the 2020 Census, Fayette County's total population was 41,990, of whom 27,558 were non-Hispanic White (65.6%) and 11,285 were non-Hispanic Black (26.9%).

13. Also, per the 2020 Census, the County's total voting-age population ("VAP") was 34,105, of whom 23,043 were non-Hispanic White (67.6%) and 8,825 were non-Hispanic Black (25.9%).

14. According to the 2018-2022 American Community Survey ("ACS"), the County's total citizen voting-age population ("CVAP") is an estimated 33,965, of whom an estimated 23,960 are non-Hispanic White (70.5%) and an estimated 9,000 are non-Hispanic Black (26.5%).

15. The current County Commission is comprised of 19 members, all of whom are White.

16. Prior to the adoption of the 2021 County Commission Plan, the 19 County Commissioners were elected from a map that contained eight multi-member districts (the "2011 Map"). Five of the districts were represented by two Commissioners, and three were represented by three Commissioners.

## The 2021 Redistricting Process

17. The County Commissioners could have adopted any of the redistricting plans with multiple majority-minority districts presented to them in 2021 that would have provided the County's Black community with an equal opportunity to elect candidates of their choice to the County Commission. Instead, the County Commissioners went against the explicit advice of their own outside redistricting counsel, as well as deviated from the criteria established by their Redistricting Committee to create multiple majority-minority districts, in adopting the 2021 County Commission Plan that did not contain a single majority BVAP district.

*The Redistricting Committee Initially Recommended Three Maps to the Joint Commission Committee.*

18. The County Commission tasked a Redistricting Committee to help draw redistricting plans and appointed the Committee's five members—the Mayor, the Administrator of Elections, a County Commissioner, a school board member, and a community member. Four of the five Committee members were White, and one was Black. The County Commission voted down a motion to add another Black member to the Redistricting Committee.

19. At the inaugural Redistricting Committee meeting, the Mayor told his fellow Committee members that the new County Commission map cannot dilute votes on the basis of race and introduced multiple maps.

20. One of the maps presented included 19 districts ("19 Districts Map"), in which each commissioner would be elected from a single-member district, and it contained two majority-minority districts. A group of citizens had published the 19 Districts Map in the local newspaper, *The Fayette Falcon*. The Mayor noted that the 19 Districts Map passed most tests, a Commissioner said that it was the fairest, and a community member expressed his support for it.

21. Another map introduced was the "District 7 Split Map," which was composed of 10 districts and did not create a majority-minority district. The map split what was then District 7 into multiple districts, none with a majority-minority population, despite there being sufficient Black population in the area to create a majority-minority district.

22. On October 12, 2021, the Redistricting Committee voted to send multiple redistricting maps to the Joint Commission Committee (which was made up of members of the Redistricting Committee and the County Commission), including the 19 Districts Map and the District 7 Split Map.

*The Joint Commission Committee Rejected the 19 Districts Map Despite Concerns About Other Maps Not Providing Minority Representation.*

23. On October 14, 2021, the Joint Commission Committee met to discuss the plans that the Redistricting Committee had recommended, and several individuals, including multiple County Commissioners, spoke in favor of the 19 Districts Map. A local official noted that the 19 Districts Map would create two majority-minority districts, and a Commissioner stated that the map followed the Tennessee Comptroller's Guidelines. That same Commissioner also expressed a desire to avoid a lawsuit if the adopted plan did not include majority-minority districts, while another Commissioner expressed support for single-member districts. Despite these comments, the motion to recommend the 19 Districts Map to the County Commission failed.

24. At the meeting, Black community members raised concerns that the other two maps before the Joint Commission Committee would not provide a fair opportunity for Black voters. For example, a community member expressed that the District 7 Split Map did not create even a single majority-minority district for Black voters to elect their candidate of choice.

25. In response to Black community members voicing concerns about the lack of majority-minority districts, a Redistricting Committee member stated, "Well, why do we even have to consider minorities? We've never considered [them] before."

26. The Joint Commission Committee did not recommend any of the maps and voted to send the maps back to the Redistricting Committee.

*The Redistricting Committee Adopted Redistricting Criteria that Included the Creation of Majority-Minority Districts, and the County Commission Retained Outside Redistricting Counsel.*

27. The Tennessee Comptroller's Guide to Local Government Redistricting states that county legislative bodies must consider minority representation when developing new district plans.

28. On October 25, 2021, the Redistricting Committee met and unanimously established redistricting criteria that required a minimum of two majority-minority districts, as well as considering creating a third majority-minority district.

29. The very next day, the County Commissioners unanimously passed a motion to hire John Ryder, an outside redistricting lawyer, to advise on majority-minority districts. This hiring was in response to the County having received a letter from a local attorney representing a coalition of elected officials and residents in Fayette County threatening litigation if majority-minority districts were not created.

30. During the redistricting process, Mr. Ryder advised that in considering whether minority voters are able to elect candidates of choice in a particular district, BVAP—not Black total population—needed to be used. Mr. Ryder also advised those districts needed to be greater than 50% BVAP.

*The Redistricting Committee Recommended Maps with Multiple Majority-Minority Districts to the County Commission.*

31. On November 2, 2021, Mr. Hill of the Tennessee Comptroller's Office presented four potential maps to the Redistricting Committee, each of which contained three majority-minority districts.

32. Of the four maps, Mr. Ryder recommended the so-called "14 Districts Map" because it contained three majority-minority districts, had the lowest population deviation of the four maps, and had compact districts.

33. The Redistricting Committee passed a motion to recommend two of the maps to the Joint Commission Committee—the 14 Districts Map and the "13 Districts, Option 2 Map," each of which created three majority-minority districts.

34. The Joint Commission Committee then met and recommended that the maps be sent to the County Commission.

*The County Commission Adopted a Map that Contained No Majority-Minority Districts.*

35. On November 16, 2021, the County Commission held a special meeting to discuss the two maps recommended by the Redistricting Committee that would have created three majority-minority districts. The Commissioners also discussed the 19 Districts Map and another one sent by Mr. Hill the weekend prior that also had three majority-minority districts.

36. But, without discussion, a Commissioner moved to adopt an entirely different map that contained *no* majority-minority districts—the "District 7 Split Map"—over the deep concerns of several attendees and Commissioners. Some Commissioners expressed concern that the District 7 Split Map contained no majority-minority districts, when there were several other maps that would have created three majority-minority districts. For example, a Commissioner noted: "I think it's appalling that someone wants to put this in when there are several on the table

with minority-majority districts." Another Commissioner objected that there was no copy of the District 7 Split Map at the meeting.

37. Jacob Swatley, an attorney working with Mr. Ryder, warned that if you have the opportunity to draw majority-minority districts and do not, you could end up in court. He said it would be difficult to defend the District 7 Split Map.

38. Notwithstanding these concerns, the Commissioners voted to adopt the District 7 Split Map with 10 yes votes, eight no votes, and one pass vote.

39. The District 7 Split Map was first published in *The Fayette Falcon* after its adoption.

*At a Special Meeting Called for the Purpose of Adding a Majority-Minority District to the District 7 Split Map, the County Commission Adopted the 2021 County Commission Plan that Again Contained No Majority-Minority Districts.*

40. On December 8, 2021, *The Fayette Falcon* ran a notice of a special meeting of the County Commission to be held less than a week later, on December 14, 2021, "for the specific purpose of adding a minority majority district" to the adopted District 7 Split Map.

41. At the December 14, 2021, special meeting, the Commissioners voted on three maps: (1) a modified version of the District 7 Split Map that one Commissioner introduced for the very first time at the start of the meeting and that had not been presented publicly before; (2) the 14 Districts Map that would have created three majority-minority districts and that had been endorsed by the Commission's own redistricting counsel; and (3) a modified version of the 19 Districts Map that would have created multiple majority-minority districts.

42. The modified District 7 Split Map was the only map that did not contain a single majority-BVAP district. Many Commissioners and community members spoke out against the map because it failed to provide for any minority representation.

43. The motion to adopt the modified version of the 19 Districts Map failed, with five Commissioners voting in favor of the map, 13 against, and one abstaining.

44. Mr. Ryder, again, endorsed the 14 Districts Map. He explained that majority-minority districts would provide the opportunity for minority voters to elect candidates of their choice and that the map met traditional redistricting principles. He reiterated that the Commissioners needed to comply with the Voting Rights Act.

45. The Commissioners voted against the adoption of the 14 Districts Map, with nine members voting in favor and 10 against.

46. Instead, the Commissioners, disregarding the advice of their own counsel and the Redistricting Committee criteria, adopted the modified District 7 Split Map by a vote of 12 to six, with one Commissioner abstaining.

47. Mr. Ryder informed the Commissioners that the 2021 County Commission Plan would not hold up under litigation.

48. The 2021 County Commission Plan immediately received community backlash. For example, a community member described the map as a tweaked version of an already terrible map that did not have any majority-minority representation. And a Commissioner added that the map was not adopted in "good faith."

49. Figure 1 depicts the 2021 County Commission Plan, and Table 1 presents the demographic data for the 10 districts in the 2021 County Commission Plan, according to 2020 Census data.



Figure 1: 2021 County Commission Plan

Table 1: 2021 County Commission Plan Demographics

| District | Number of Commissioners | Total POP | Total VAP | WVAP | BVAP |
|---|---|---|---|---|---|
| 1 | 2 | 4,503 | 3,527 | 54.47 | 38.59 |
| 2 | 2 | 4,283 | 3,438 | 61.20 | 33.16 |
| 3 | 2 | 4,255 | 3,400 | 62.24 | 27.03 |
| 4 | 2 | 4,426 | 3,568 | 76.09 | 17.26 |
| 5 | 3 | 6,663 | 5,655 | 70.65 | 23.34 |
| 6 | 2 | 4,441 | 3,716 | 73.84 | 20.59 |
| 7 | 1 | 2,164 | 1,707 | 48.39 | 48.62 |
| 8 | 2 | 4,456 | 3,701 | 78.06 | 15.08 |
| 9 | 2 | 4,631 | 3,615 | 67.94 | 24.68 |
| 10 | 1 | 2,168 | 1,778 | 71.82 | 23.85 |

**The 2021 County Commission Plan Was Motivated, at Least in Part, by a Discriminatory Purpose**

50. The impact of the 2021 County Commission Plan has been to dilute Black voting strength in Fayette County by failing to provide Black voters an equal opportunity to elect candidates of choice: the 2021 County Commission Plan has resulted in Fayette County having no Black County Commissioners for the first time in over 20 years.

51. Since the 2021 County Commission Plan went into effect, four Black candidates ran in the 2022 general election for County Commission, but none was elected to the Commission. Another Black candidate, Mr. Sylvester Logan, an incumbent under the 2011 Map who had consistently won election for many years, lost to a White candidate in the 2022 Republican primary.

52. Defendants' actions during the 2021 redistricting process were a continuation of the 2011 redistricting process, in which the Commission placed substantial Black populations into large rural districts where they had no hope of representation, given racially polarized voting and the fact that Black voters were outnumbered by White voters.

53. One example of this is District 3, as its BVAP dropped by approximately 22 percentage points between the redistricting plan that was adopted in 2001 and the 2021 County Commission Plan. Black candidates had been able to be elected under the 2001 redistricting plan and for the first election under the 2011 Map, but not so after.

54. The approach during the 2021 redistricting cycle also differed from past redistricting cycles. For example, during the 2011 redistricting process, draft redistricting maps were published in the local newspaper and an informal public viewing session of the draft maps was held before the final map was adopted. And during the 2001 redistricting cycle, the Reapportionment Committee publicly presented its recommended map during its October 11,

2001, meeting, and the County Commission adopted the final map at a meeting on October 23, 2001.

55.    After the Commissioners passed the Modified District 7 Split Map, one commissioner acknowledged that "the County commission was specifically advised by our lawyer to avoid the map that was adopted."

### The 2021 County Commission Plan Has a Discriminatory Result

56.    The 2021 County Commission Plan results in denying or abridging the right of Black voters in Fayette County to participate equally in the political process.

57.    Black persons in Fayette County are sufficiently numerous and geographically compact to constitute a majority in at least two single-member districts. It is possible to draw a districting plan in Fayette County in which Black persons constitute a majority of the voting-age population in multiple single-member districts in a 19-district plan under the 2020 Census. Indeed, the 19 Districts Plan proposed in the 2021 redistricting process is an example of such an illustrative districting plan. There were also other plans presented in the 2021 redistricting process that would have created multiple districts in which Black voters would be a majority of the voting-age population.

58.    Black voters in Fayette County are politically cohesive and have regularly voted for the same candidates in contests for the County Commission and for other offices in the past decade.

59.    Voting in Fayette County is racially polarized.

60.    In the past decade, non-Hispanic White voters voted sufficiently as a bloc usually to defeat preferred candidates of Black voters in contests for County Commission and for other offices.  *See also Rural W. Tenn. African-American Affairs Council, Inc. v. Sundquist*, 209 F.3d

12

835, 844 (6th Cir. 2000) ("Legislative elections in the six[-]county area [including in Fayette County] are racially polarized[.]").

62. Fayette County has a long history of discrimination, including discrimination regarding the right to vote.

62. In the 1950s and 1960s, the United States filed two lawsuits to protect the right to vote of Black voters in Fayette County. *See, e.g.*, *United States v. Fayette Cnty. Democratic Exec. Comm.*, No. 3835 (W.D. Tenn. 1959) (challenging the Fayette County Democratic Executive Committee's denial of Black citizens' right to vote and resolved through a consent decree in 1960 pursuant to which voter registration resumed); *United States v. Atkeison*, No. 4131 (W.D. Tenn. 1960) (challenging the retaliatory evictions of Black Fayette County sharecroppers for exercising their right to vote and resolved through a consent decree in 1962 pursuant to which the parties agreed that such evictions would stop).

63. Black voters in Fayette County have experienced other official discrimination impacting their right to vote. In 2000, the Sixth Circuit affirmed that a House redistricting plan for six western counties in Tennessee, including Fayette County, violated Section 2 of the Voting Rights Act. *See Sundquist*, 209 F.3d at 835.

64. Significant socioeconomic disparities exist between Black and White residents of Fayette County. These disparities hinder the ability of Fayette County's Black residents to participate effectively in the political process.

65. According to 2018-2022 5-Year ACS estimates, the mean per capita income for the County's White residents is almost double the mean per capita income for Black Fayette County residents ($48,007 vs. $25,767). Further, 21.7% of the County's Black residents live below the poverty line compared to 4.3% of the County's White residents. Likewise, 64.0% of

13

Black households in Fayette County receive Supplemental Nutrition Assistance Program ("SNAP") benefits, while 31.8% of White households receive such benefits.

66. There are also disparities in education between Fayette County's Black and White residents. According to 2018-2022 5-Year ACS estimates, 93.1% of Fayette County's White residents have at least a high school diploma compared to 85.5% of Fayette's Black residents. The difference is even starker with respect to post-secondary education—the percent of White residents with a bachelor's degree or higher is almost double that of Black residents (28.8% vs. 16.6%).

67. Further, and according to 2018-2022 5-Year ACS estimates, the unemployment rate for Fayette County's Black residents is more than three times that of Fayette County's White residents (10.7% vs. 3.4%). In addition, the rate of Black residents without health insurance is almost double that of White residents (11.5% vs. 6.1%).

68. Fayette County uses electoral devices that enhance the opportunity for discrimination. The County utilizes a numbered post system, in which candidates in multi-member districts run for designated seats. Further, county commission primary and general elections are not held at the same time as the primary and general elections for state and federal offices.

69. Black residents are underrepresented in elected office in Fayette County. There are currently no Black Commissioners. Further, upon information and belief, no Black resident has ever held any countywide office. No Black resident has represented Fayette County as a state senator or as a state representative, at least since Reconstruction. And, upon information and belief, no Black resident has held a judgeship in the County.

70. The County Commission has shown a lack of responsiveness to issues that are of importance to Fayette's Black community, including the need for investment in schools, community centers, playgrounds, and parks.

71. The stated reason underlying the passage of the 2021 County Commission Plan was tenuous. The Commissioner who introduced the 2021 County Commission Plan at the December 14, 2021, special meeting cited creating a true majority-minority District 7 as the reason for enacting the Plan. Yet, District 7 is not a true majority-minority district because it does not have a majority BVAP. *See supra* Table 1.

72. The Commission's stated desire to protect incumbents and preserve the status quo is contradicted by the fact that four Commissioners had to switch districts to run under the 2021 County Commission Plan.

## CAUSES OF ACTION

### COUNT I
*Intentional Racial Discrimination in Violation of Section 2 of the Voting Rights Act, 52 U.S.C. § 10301*

73. The United States realleges and incorporates by reference the allegations set forth in paragraphs 1-72 above.

74. The 2021 County Commission Plan was adopted with the purpose, at least in part, of denying or abridging the right to vote on account of race or color in violation of Section 2 of the Voting Rights Act, 52 U.S.C. § 10301.

75. Unless enjoined by order of this Court, Defendants will continue to violate Section 2 by administering, implementing, and conducting elections for the County Commission using the 2021 County Commission Plan.

## COUNT II
*Discriminatory Results in Violation of Section 2 of the Voting Rights Act, 52 U.S.C. § 10301*

76. The United States realleges and incorporates by reference the allegations set forth in paragraphs 1-72 above.

77. Under the totality of circumstances, the 2021 County Commission Plan results in Black voters having less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice, in violation of Section 2 of the Voting Rights Act, 52 U.S.C. § 10301.

78. Unless enjoined by order of this Court, Defendants will continue to violate Section 2 by administering, implementing, and conducting elections for the County Commission using the 2021 County Commission Plan.

**PRAYER FOR RELIEF**

WHEREFORE, the United States prays that the Court enter an order:

(1) Declaring that the 2021 County Commission Plan was adopted, at least in part, with the purpose of denying or abridging the right to vote on account of race or color, in violation of Section 2 of the Voting Rights Act, 52 U.S.C. § 10301;

(2) Declaring that the 2021 County Commission Plan results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, in violation of Section 2 of the Voting Rights Act, 52 U.S.C. § 10301;

(3) Enjoining Defendants, their agents and successors in office, and all persons acting in concert with them from administering, implementing, or conducting any future elections for the County Commision under the 2021 County Commission Plan;

(4) Ordering Defendants to devise and implement a permanent redistricting plan for

the County Commission that complies with Section 2 of the Voting Rights Act, 52 U.S.C.

§ 10301; and

  (5) Granting such additional relief as the interests of justice may require.

Date: January 15, 2025

| | |
|---|---|
| REAGAN TAYLOR FONDREN<br>Acting United States Attorney<br>Western District Of Tennessee | KRISTEN CLARKE<br>Assistant Attorney General<br>Civil Rights Division<br><br>R. TAMAR HAGLER<br>Chief |
| /s/ *Sarah Pazar Williams*<br>SARAH PAZAR WILLIAMS (TN Bar No. 031261)<br>Assistant United States Attorney<br>United States Attorney's Office<br>Western District Of Tennessee<br>167 North Main Street, Suite 800<br>Memphis, Tennessee 38103<br>(901) 544-4231<br>sarah.williams2@usdoj.gov | /s/ *Jacki Anderson* (*per email consent* 1/15/25)<br>TIMOTHY F. MELLETT (DC Bar No. 430968)**<br>JACKI L. ANDERSON (DC Bar No. 1531821)*<br>THARUNI A. JAYARAMAN (DC Bar No. 230865)*<br>Attorneys, Voting Section<br>Civil Rights Division<br>U.S. Department Of Justice<br>950 Pennsylvania Avenue NW<br>Washington, DC 20530<br>(202) 307-2767<br>timothy.f.mellett@usdoj.gov<br>jacki.anderson@usdoj.gov<br>tharuni.jayaraman@usdoj.gov<br><br>*Admission pending<br>**Admission motion forthcoming |